UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

V.

KIMBERLY KIEHL

CASE NO.  8:22-cr-00441-CEH-LSG
18 U.S.C. § 1341
21 U.S.C. §§ 331(i)(3) & 333(a)(2)

## SUPERSEDING INFORMATION

The Acting United States Attorney charges:

### COUNT ONE
**(Mail Fraud)**

**A.    Introduction**

JUL 10 2025 PM2:51
FILED - USDC - FLMD - TPA

At times material to this Superseding Information:

*The Defendant and the Company*

1.    KIMBERLY KIEHL, a resident of the Middle District of Florida, who was not a health care provider or a licensed wholesale distributor of prescription drugs registered with the United States Food and Drug Administration or the State of Florida, was the owner and operator of Focus Beauty, LLC. KIEHL ordered, purchased, imported, received, and distributed misbranded and counterfeited drugs and medical devices.

2.    Focus Beauty, LLC was a Florida limited liability company reportedly headquartered in Lakeland, Florida. KIEHL was the entity's registered agent and authorized member.

3.    KIEHL used the website www.focusisbeauty.com and the email address info.focusbeauty@gmail.com in connection with the sale of misbranded and counterfeited drugs and medical devices.

4.    KIEHL used the United States Postal Service ("USPS") and private and commercial interstate carriers to acquire and distribute misbranded and counterfeited drugs and medical devices.

*The Food and Drug Administration's Regulation of Medical Devices and Drugs*

5.    The Food and Drug Administration ("FDA") was the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"). Among other responsibilities, the FDA enforced laws and regulations intended to ensure that drugs were safe and effective for their intended uses.

6.    The FDCA defined a "device," in relevant part, as "an instrument, apparatus, implement, machine, contrivance, implant, *in vitro* reagent, or other similar or related article, including any component, part, or accessory, which is . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or intended to affect the structure or function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. § 321(h)(1).

2

7.     The FDCA defined a "counterfeit device" as a "device which, or the container, packaging, or labeling of which, without authorization, bears a trademark, trade name, or other identifying mark or imprint, or any likeness thereof, or is manufactured using a design, of a device manufacturer, processor, packer, or distributor other than the person or persons who in fact manufactured, processed, packed, or distributed such device and which thereby falsely purports or is represented to be the product of, or to have been packed or distributed by, such other device manufacturer, processor, packer, or distributor." 21 U.S.C. § 321(h)(2).

8.     The FDCA classified devices into three categories: Class I (lowest risk), Class II (moderate risk), or Class III (highest risk). 21 U.S.C. § 360c. A device classified as Class III was required to have an FDA approved application for pre-market approval ("PMA") before the device could be distributed in interstate commerce. 21 U.S.C. § 360e(a)(2).

9.     The FDCA defined a "prescription device" as "a device which, because of any potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use is not safe except under the supervision of a practitioner licensed by law to direct the use of such device ... ." 21 C.F.R. § 801.109.

10.     A device was adulterated if, among other things, it was a Class III device pursuant to 21 U.S.C. § 360c(f), and was required under 21 U.S.C. § 360e(a) to have in effect an approved PMA, and did not have such an approval in effect. 21 U.S.C. § 351(f).

3

11.     A device was misbranded if its labeling was false or misleading in any particular. 21 U.S.C. § 352(a)(1). The FDCA defined "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

12.     The FDCA, in relevant part, defined drugs as products that were "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" (21 U.S.C. § 321(g)(1)(B)); and "articles (other than food) intended to affect the structure or any function of the body of man or other animals" (21 U.S.C. § 321(g)(1)(C)).

13.     A "new drug" was defined as "[a]ny drug ... the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1).

14.     Under the FDCA, a drug product that was a "new drug" could not be lawfully introduced into interstate commerce unless and until a sponsor submitted a new drug application for that drug product and FDA determined that the drug was safe and effective for its intended uses and approved that new drug application. 21 U.S.C. § 355(a).

15.     Under the FDCA, a "counterfeit drug" meant "a drug which, or the container or labeling of which, without authorization, bears the trademark, trade name, or other identifying mark, imprint, or device, or any likeness thereof, of a drug

4

manufacturer, processor, packer, or distributor other than the person or persons who in fact manufactured, processed, packed, or distributed such drug and which thereby falsely purports or is represented to be the product of, or to have been packed or distributed by, such other drug manufacturer, processor, packer or distributor." 21 U.S.C. § 321(g)(2).

16.     Under the FDCA, a "prescription drug" was any drug intended for use in humans that, because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary for its use, was not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or was limited by an approved application under section 21 U.S.C. § 355 for use under the professional supervision of a practitioner licensed by law to administer such drug. 21 U.S.C. § 353(b)(1).

17.     A drug was misbranded if its labeling was false or misleading in any particular. 21 U.S.C. § 352(a)(1).

*Relevant Prescription Drugs and Medical Devices*

18.     Botulinum Toxin Type A was a highly potent toxin which could cause the disease botulism when present in human beings in a sufficient amount. In 1991, the FDA approved a biological products license for Botox, the brand name of a drug derived from Botulinum Toxin Type A and manufactured by Allergan, for the treatment of cervical dystonia in adults. In 2002, the FDA approved a supplement to Allergan's Botox license application for the treatment of glabellar lines, commonly referred to as wrinkles.

5

19.   Dermal fillers were injectable products that were intended to sit under the surface of the skin and plump or fill the space under the skin. Dermal fillers did not achieve their primary intended purpose through chemical reaction within or on the body and were not dependent upon being metabolized for the achievement of their primary intended purposes. Dermal fillers, such as Juvéderm, Sculptra, and Restylane, were Class III prescription devices and required pre-market approval by the FDA.

### B.   Scheme and Artifice

20.   Beginning in or about January 2019, and continuing through in or about October 2021, in the Middle District of Florida and elsewhere, the defendant,

KIMBERLY KIEHL,

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises relating to material facts.

### C.   Manner and Means of the Scheme and Artifice

21.   The manner and means by which the defendant sought to accomplish the scheme and artifice included, among others, the following:

a.   It was a part of the scheme and artifice that the defendant would and did order, purchase, import, and receive misbranded and counterfeited drugs and devices from a foreign source;

6

b.      It was a further part of the scheme and artifice that the defendant would and did use, and cause to be used USPS and private and commercial interstate carriers to receive misbranded and counterfeited drugs and devices;

c.      It was a further part of the scheme and artifice that the defendant would and did operate Focus Beauty from her residence where she stored and distributed misbranded and counterfeited drugs and devices;

d.      It was a further part of the scheme and artifice that the defendant would and did use false and fraudulent pretenses and representations on the Focus Beauty website, www.focusisbeauty.com, including false and misleading images representing that Focus Beauty products were legitimate products;

e.      It was a further part of the scheme and artifice that the defendant would and did use the Focus Beauty website, www.focusisbeauty.com, to advertise and sell misbranded and counterfeited drugs and devices, and to solicit customers' orders from across the United States;

f.      It was a further part of the scheme and artifice that the defendant would and did use private and commercial interstate carriers to ship packages of misbranded and counterfeited drugs and devices purchased by customers;

g.      It was further part of the scheme and artifice that the defendant would and did use the email address info.focusbeauty@gmail.com to correspond with Focus Beauty customers about order numbers and commercial interstate carrier tracking numbers for packages of misbranded and counterfeited drugs and devices purchased from the Focus Beauty website;

h.     It was further part of the scheme and artifice that the defendant would and did use fraud proceeds for her own personal enrichment and for the benefit of others;

i.     It was further part of the scheme and artifice that the defendant would and did misrepresent, hide, and conceal and cause to be misrepresented, hidden, and concealed, the purpose of the scheme and artifice and the acts performed in furtherance of the scheme.

### D. Execution of the Scheme and Artifice

22.     On or about September 7, 2021, in the Middle District of Florida, the defendant,

### KIMBERLY KIEHL,

for the purpose of executing and attempting to execute the aforesaid scheme and artifice, did knowingly and intentionally deposit and cause to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, that is purchase order-4476 for Intense Repair Serum, which bore the images of Botox and Daewoong Botulinum Toxin Type A Nabota.

In violation of 18 U.S.C. § 1341.

8

## COUNT TWO
### (Causing to be Made, Selling, and Holding for Sale a Counterfeit Drug)

### A.    Introduction

23.    Sections A and C of Count One of this Superseding Information are hereby realleged and incorporated by reference as if fully set forth herein.

### B.    Charge

24.    On or about October 14, 2021, in the Middle District of Florida, the defendant,

KIMBERLY KIEHL,

did with intent to defraud and mislead, and without the authorization of Allergan, sell, dispense, and hold for sale and dispensing, vials marked as "Botox 100 Unite," said marks being the trademark of Allergan, which drugs were not manufactured by or under the authorization of Allergan.

In violation of 21 U.S.C. §§ 331(i)(3) and 333(a)(2).

### FORFEITURE

1.    The allegations contained in Counts One and Two of this Superseding Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. §§ 981(a)(1)(C) and 2323(b), 21 U.S.C. § 334, and 28 U.S.C. § 2461(c).

2.    Upon a conviction of a violation of 18 U.S.C. § 1341, the defendant, KIMBERLY KIEHL, shall forfeit to the United States, pursuant to 18 U.S.C. §

981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

3.     Upon a conviction of a violation of 21 U.S.C. §§ 331(i)(3), the defendant, KIMBERLY KIEHL, shall forfeit to the United States, pursuant to 21 U.S.C. § 334 and 28 U.S.C. § 2461, any new drug that had not been approved by the FDA when introduced into interstate commerce.

5.     The property to be forfeited includes, but is not limited to, approximately $47,773 seized from the defendant's residence on or about October 14, 2021, as well as an order of forfeiture in the amount of approximately $204,730, which represents the total amount of proceeds the defendant obtained from the offenses.

6.     If any of the property described above, as a result of any act or omission of the defendant:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third party;

  c. has been placed beyond the jurisdiction of the court;

  d. has been substantially diminished in value; or

  e. has been comingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

SARA C. SWEENEY
Acting United States Attorney

By: _____
Tiffany E. Fields
Assistant United States Attorney

By: _____
Carlton C. Gammons
Assistant United States Attorney
Chief, Economic Crimes Section

11